John C. MIDDLETON, et al., Appellants,

v.

MISSOURI DEPARTMENT OF CORRECTIONS, et al., Respondents.

No. SC 89571.

Supreme Court of Missouri, En Banc.

Feb. 24, 2009.

As Modified on Denial of Rehearing March 31, 2009.

Joseph W. Luby, Public Interest Litigation Clinic, Kansas City, John W. Simon, Constitutional Advocacy, LLC, Christopher E. McGraugh, Leritz, Plunkert & Bruning, P.C., S. Paige Canfield, Richard Sindel, Sindel Sindel & Noble, P.C., St. Louis, Cheryl A. Pilate, Rebecca L. Kurz, Morgan Pilate LLC, Olathe, for appellants.

Chris Koster, Atty. Gen., Michael J. Spillane, Asst. Atty. Gen., Jefferson City, for respondents.

Jean Maneke, The Maneke Law Group, L.C., Kansas City, for amicus curiae Missouri Press Association.

Michael J. Gorla, Eric W. Butts, St. Louis, Jennifer Herndon, Florissant, Elizabeth Unger Carlyle, Columbus, MS, John K. Power, Husch Blackwell Sanders LLP, Jennifer A. Merrigan, Public Interest Litigation Clinic, Kansas City, Jeremy S. Weis, Berkowitz Oliver Williams Shaw & Eisenbrandt LLP, Prairie Village, KS, for amicus curiae.

MARY R. RUSSELL, Judge.

Seventeen inmates who have been sentenced to death and other interested parties ("Appellants") challenge the Missouri Department of Corrections' ("DOC") adoption of a lethal injection protocol. Appellants allege that DOC violated the Missouri Administrative Procedure Act ("MAPA") section 536.021, RSMo Supp. 2007,[1] in that DOC did not undertake notice and public comment rulemaking when formulating the protocol. They allege this renders it void. The circuit court dismissed the action, finding that the protocol was not a rule.

This Court has jurisdiction pursuant to article V, section 10 of the Missouri Constitution. This Court finds that the protocol does not violate MAPA because it is

---

1. All statutory references are to RSMo Supp. 2007 unless otherwise noted.

not a rule and, therefore, is not subject to notice and comment rulemaking procedures. As such, the circuit court's judgment is affirmed.

## I. Background

DOC issued an execution protocol in July 2006, setting out the steps necessary for preparation, injection, and monitoring of lethal injections pursuant to section 546.720. This provision states that "the punishment of death shall be by the administration of lethal gas or by means of the administration of lethal injection" and authorizes the DOC director to provide the necessary facilities, appliances, and execution team for its administration.

To this end, the execution protocol describes the technical duties of an execution team consisting of DOC employees and medical personnel. The protocol describes the proper procedure for preparing syringes and the proper quantities of injection chemicals. It also provides that the chemicals are administered by DOC employees under the supervision of outside medical personnel, who also monitor the prisoners' condition, pronounce death, and dispose of and document the chemicals.[2]

Appellants alleged that the protocol is void because DOC did not undertake notice and comment rulemaking as outlined by MAPA. The circuit court rejected Appellants' arguments, finding that MAPA was not violated because the execution protocol was not a rule. It found that two statutory exemptions to the definition of a rule applied: (1) section 536.010(6)(a), regarding matters "concerning only the internal management" of the agency; and (2) section 536.010(6)(k), regarding matters "concerning only inmates."

## II. Standard of Review

■ This case presents a question of statutory interpretation, which is an issue of law that this Court reviews *de novo. Finnegan v. Old Republic Title Co. of St. Louis, Inc.,* 246 S.W.3d 928, 930 (Mo. banc 2008).

## III. Analysis

### A. Section 536.010(6)(k) exempts the protocol

The issue presented requires this Court to determine if the General Assembly intended that an execution protocol be exempt from notice and comment rulemaking procedures. MAPA defines a "rule" as a "statement of general applicability that implements, interprets, or prescribes law or policy." Section 536.010(6). Subsection 536.010(6)(k) specifically exempts "[a] statement *concerning only inmates* of an institution under the control of the department of corrections ... when issued by such an agency." (emphasis added). This subsection functions to exempt a statement that otherwise would be subject to rulemaking procedures, and in context, it clearly exempts the execution protocol from rulemaking here.

■ Resolution of this matter turns on the legislature's understanding of the word "only" in the rulemaking exemption "concerning only inmates."[3] *See* section

---

**2.** The protocol is titled "Preparation and Injection of Chemicals." It contains a series of directives. Typical of the protocol is the directive, "Medical personnel attach the leads from the electrocardiograph to the prisoner's chest." And, "Syringes 1 A, 2A, 3A, and 4A each contain 1.25 grams of thiopental."

**3.** For example, "only" could mean that no person outside of DOC can be involved in a protocol's implementation for the exemption to apply. On the other hand, "concerning only inmates" might mean "directed only at inmates." This reading would allow other people to be implicated in a protocol so long as they were not its object. Or, "only" could

536.010(6)(k). As such, a few principles of statutory construction are worth repeating. When ascertaining the legislature's intent in statutory language, it commonly is understood that each word, clause, sentence, and section of a statute should be given meaning. *See Mo. Prop. & Cas. Ins. Guar. Ass'n v. Pott Indus.*, 971 S.W.2d 302, 305 (Mo. banc 1998). The corollary to this rule is that a court should not interpret a statute so as to render some phrases mere surplusage. *See Spradlin v. City of Fulton*, 982 S.W.2d 255, 262 (Mo. banc 1998). Consistent with these principles, a sentence should not be given a meaning that thwarts a section; a clause should not undermine a sentence.

■ The legislature exempted 13 areas from rulemaking in section 536.010(6). This Court must give meaning to all of the exempted areas in these subsections, including the one described in subsection 536.010(6)(k) that exempts statements "concerning only inmates." Moreover, a meaningful reading of the exemption is consistent with other states' general view that "promulgation requirements of public notice, public hearing, attorney general approval, and filing with the state are simply not realistic requirements for implementing procedures that concern the intricacies and complexities of a prison environment." *Abdur'Rahman v. Bredesen*, 181 S.W.3d 292, 312 (Tenn.2005).[4] With these factors in mind, and reading the statutory language in context, it is apparent that the legislature intended "concerning only inmates" simply to limit who may be the direct subject of a protocol or statement. This avoids imputing an arbitrary legislative intent that otherwise would result if the subsection turned on who generally was involved in implementing a protocol or on who was present.

Indeed, in some sense, nearly every aspect of prison life involves people from outside the prison system, such as cafeteria food made with ingredients from outside sources, specialized hospital care, and interagency transportation. The protocol in this case concerns the technical procedure that guides medical personnel who are members of an "execution team" in preparing chemicals for lethal injection and in supervising their administration. The medical professionals are serving a technical role. Beyond the fact that their skills are needed to carry out the technical provisions effectively, this is not a protocol that is concerned with directing the behavior of medical professionals, whose role is incidental.[5]

be a form of emphasis, drawing attention to the words that follow.

4. *Abdur'Rahman* considered a similarly worded exemption to rulemaking ("concerning inmates"), and the court there found that Tennessee's lethal injection protocol was exempt. 181 S.W.3d at 311–12. *See also L'Heureux v. State Dep't of Corr.*, 708 A.2d 549, 553 (R.I. 1998) (observing with approval that "[n]umerous other jurisdictions that have considered the application of their administrative-procedure statutes to correctional institutions have rejected their applicability").

5. Compare this to the scenario in *Wilkinson v. State*, 172 Ariz. 597, 838 P.2d 1358 (1992). *Wilkinson* interpreted an exemption in Arizona "concerning only inmates" as applied to the visitation of an inmate's minister, whose access had not been impeded previously. *Id.* at 1359. The *Wilkinson* court found that "the DOC's religious visitation rules concern not just the inmates, but also the religious leaders who visit them." *Id.* at 1360. In so holding, the court explicitly relied on two statements. One was a former version of the rule, which stated: "Visits by *religious leaders* may be denied only because such a visit is deemed to be a threat to the safety and security of the institution." *Id.* (emphasis added). The other was a related rule concerning the "credentials of religious leaders." *Id.*

As can be seen, the procedures in *Wilkinson* have a different character than the protocol in this case because that rule was directed at

Additionally, this protocol does not affect the rights of persons allowed to be witnesses under section 546.740, RSMo 2000. Section 546.740 specifically sets out the number and types of people who are allowed to attend executions, and the execution protocol does not alter this criteria. Section 546.740 criteria also highlight that an execution is not a public event. Further, the witnesses who are present do not participate in the procedural directives outlined in the protocol: preparing chemicals, using intravenous lines, medically monitoring the prisoner, and administrating and documenting chemicals. As such, no direct connection exists between witnesses and the protocol beyond that of individual interest. And, merely because an event or topic is interesting or important does not make it subject to rulemaking given that there is a specific statutory exemption, "concerning only inmates." Any other conclusion would impute an irrational legislative intent.[6]

### B. Section 546.720.2 shows an intent to exempt the protocol

Although the exemption to rulemaking in section 536.010(6)(k) clearly applies here, this conclusion also is supported by ascertaining the legislative intent in the relevant statutory provisions. *See Estate of Williams v. Williams*, 12 S.W.3d 302, 306 (Mo. banc 2000).

Here, the General Assembly has crafted section 546.720 to establish the permissible types of execution, granting DOC power to organize and to perform these executions. As part of this statute, the General Assembly also saw fit to make a statement regarding the public's access to the protocol, stating that "[t]he section of an execution protocol that directly relates to the administration of lethal gas or lethal chemicals is an open record, the remainder of any execution protocol of the department of corrections is a closed record." Section 546.720.2. This is significant because, to the extent that the statute declares part of the protocol to be an open record, this reflects the intent that the protocol not be subject to the rulemaking statutes, as there would be no need for such a declaration if the protocol were a rule. *See* section 536.021 (providing for notice and public comment when rulemaking, an inherently public process). And, to the extent the statute provides that part of the protocol is a closed record, it is rendered meaningless if the closed portion must be promulgated publicly as a rule.

Read most naturally, this language demonstrates that the General Assembly crafted the statute with the understanding that execution protocols would not be subject to rulemaking. It is this Court's role to effectuate this intent.

---

non-inmates. In contrast, the protocol here is directed solely at inmates. It makes no reference to the validity of the medical professionals' credentials, to alterations to prisoner access based on the medical professionals' characteristics, or to equivalent rights or procedures enjoyed by the public. Here, the professionals simply are accepting a particular job, and this protocol provides that job's technical instructions.

**6.** To hold otherwise would construe the language to reflect one of the following irrational

intents: (1) to exempt protocols when a medical professional happens to be directly employed by DOC, but to require rulemaking when the medical professional is not so employed; (2) to apply the language "concerning only inmates" to mean that no one can be involved in implementing a protocol, which renders the exemption meaningless; or (3) to apply the language to all matters about which some member of the public feels strongly, which renders the exemption meaningless because every aspect of prison life is of concern to someone.

## IV. Conclusion

The legislature has acted in section 536.010(6)(k) to exempt statements and procedures from rulemaking when they are directed solely at inmates, such as the protocol in this case. This intent is also implicit in section 546.720.2. This demonstrates that the General Assembly did not intend that notice and comment rulemaking be the avenue for bringing challenges to the State's ability to execute death row inmates.[7]

The circuit court's judgment is affirmed.

PRICE, BRECKENRIDGE and FISCHER, JJ., concur; TEITELMAN, J., dissents in separate opinion filed; STITH, C.J., and WOLFF, J. concur in opinion of TEITELMAN, J.; WOLFF, J., dissents in separate opinion filed; STITH, C.J., concurs in opinion of WOLFF, J.

RICHARD B. TEITELMAN, Judge, dissenting.

I respectfully dissent. Section 536.010(6)(k)[1] exempts from rulemaking any agency statement "concerning only inmates." The undisputed facts of this case show that the execution protocol is carried out by individuals who are not inmates. The execution protocol, therefore, is not an agency statement "concerning only inmates" and is not exempt from rulemaking on that basis.

The primary rule of statutory construction is to ascertain the intent of the legislature by giving the language used its plain and ordinary meaning. *United Pharmacal Co. of Missouri, Inc. v. Missouri Bd. of Pharmacy*, 208 S.W.3d 907, 909 (Mo. banc 2006). "Where the language is clear and unambiguous, there is no room for construction." *Hyde Park Housing Partnership v. Director of Revenue*, 850 S.W.2d 82, 84 (Mo. banc 1993).

The principal opinion avoids the plain language of section 536.010(6)(k) by asserting that the statute is ambiguous. There is no ambiguity. The word "concerning" means "relating to." WEBSTER'S 3RD NEW INTERNATIONAL DICTIONARY (1993). The word "only" means "a single solitary fact or instance or occurrence; solely; exclusively." *Id.* Consequently, the phrase "concerning only inmates" means an agency statement or protocol relating exclusively to inmates.

The undisputed facts of this case show that the execution protocol does not relate exclusively to inmates. The execution protocol directs the actions of the medical professionals who carry out the execution. Without the participation of medical professionals performing their duties pursuant to the dictates of the execution protocol, there would be no execution. This reality eliminates any basis for concluding that the execution protocol is a matter "concerning only inmates." To conclude otherwise would read the phrase "concerning only inmates" out of the statute.

In contrast to this straightforward analysis, the principal opinion concludes that "this is not a protocol that is concerned with directing the behavior of medical professionals, whose role is incidental." The word "incidental" means "non-essential" or "occurring merely by chance or without intention or calculation." WEBSTER'S 3RD

---

7. Judge Wolff's dissent articulates a view that reflects a lack of confidence in the legislative process, suggesting that the legislature "didn't think about the matter at all." A complete reading of the statutes analyzed leads to an opposite conclusion. If the legislature intend-ed to make the lethal injection protocol subject to notice and public comment, however, it can do so.

1. All statutory references are to RSMo Supp. 2007 unless otherwise noted.

New International Dictionary (1993). The actions of medical professionals are not a mere incident to an execution. The very purpose of the execution protocol is to direct medical professionals administering lethal chemicals with the purpose of ending the life of another human being. Medical professionals are strictly necessary to the process. It is, therefore, untenable to conclude that the protocol under which the professionals operate does not concern or relate to them.

The principal opinion also relies on section 546.720.2 as additional evidence of legislative intent to exempt the execution protocol from rulemaking procedures. Section 546.720.2 provides that the execution protocol is an open record insofar as the protocol directly relates to the administration of lethal gas or chemicals. In all other respects, the protocol is a closed record. The majority asserts that both the open record and closed record provisions indicate legislative intent to exempt the execution protocol from rulemaking. In other words, the principal opinion asserts that "open and closed" both mean "closed." It is at least equally plausible, however, to conclude that the open records provision in section 546.720.2 indicates that the legislature wished to emphasize that the lethal injection procedures in the execution protocol are subject to rulemaking. This interpretation would be consistent with the plain language meaning of the "concerning only inmates" rulemaking exemption, which, as previously established, does not apply to the execution protocol.

I would hold that the execution protocol is a rule and is not subject to a statutory exemption. Failure to promulgate a rule as required voids the decision that should have been promulgated as a rule. *NME Hospitals, Inc. v. Department of Social Services,* 850 S.W.2d 71, 74–75 (Mo. banc 1993)(an agency decision that should have been promulgated as a rule, but was not promulgated according to the rulemaking procedures set out in Missouri Administrative Procedure Act, will be invalidated). The judgment dismissing appellants' lawsuit should be reversed.

MICHAEL A. WOLFF, Judge, dissenting.

I write to explore the elusive concept of "legislative intent" that guides the principal opinion. The statute, section 536.010(6), RSMo 2000, does not deal directly with matters involving the execution of prisoners, but it does say that matters concerning "only" inmates are not included in the administrative rules process. This statute, the principal opinion says, presents an "ambiguity" that must be resolved by discerning "legislative intent."

Translation: What do we think the legislature was thinking if the legislature was thinking about this subject at all? Or, perhaps, more accurately: What do we think the legislature would think?

This line of analysis, I believe, needs a name. I would suggest, respectfully: "Imagined Legislative Intent" or "Anticipatory Legislative Intent."

> Justice Scalia has described the
>
> regular method for interpreting the meaning of language in a statute: first, find the ordinary meaning of the language in its textual context; and second, using established canons of construction, ask whether there is any clear indication that some permissible meaning other than the ordinary one applies. If not— and especially if a good reason for the ordinary meaning appears plain—we apply that ordinary meaning.

*Chisom v. Roemer* 501 U.S. 380, 404, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991) (Scalia, J., dissenting). *See, generally, Chevron*

*U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). It is not, as Justice Scalia explains, the role of the court to render its expectation about what the legislature must have meant, but rather to look at the words of the statute itself. 501 U.S. at 405, 111 S.Ct. 2354. In this regard, the principal opinion seems to take the position that the legislature could not really have meant to include the execution protocol in the definition of a rule, and so, therefore, the legislature did not so include it. As the principal opinion concludes: "Read most naturally, this language demonstrates that the General Assembly crafted the statute with the understanding that execution protocols would not be subject to rulemaking. It is this Court's role to effectuate this intent."

Of course, it is far more likely, when considering this general statute as to administrative agency rules, that the legislature, as a body, did not consider the execution protocol at all. Perhaps if the legislature had considered the execution protocol, it would have mentioned it in the statute, and we would have explicit guidance to exclude or include the execution protocol in the definition of an agency rule.

In the absence of actual words, it is hard to discern the legislature's "understanding" of a specific exception to the statute's general provisions. Indeed, the legislature has proven its ability to indicate explicitly its awareness of an execution protocol. In section 546.720.2, RSMo 2000, the legislature makes specific mention of an "execution protocol," stating that "[t]he section of an execution protocol that directly relates to the administration of lethal gas or lethal chemicals is an open record, the remainder of any execution protocol of the department of corrections is a closed record."

But here, we do not have any such guidance. To quote Justice Scalia again, speaking not *ex cathedra* but in a law review: " ... to tell the truth, the quest for 'genuine' legislative intent is probably a wild goose chase anyway." [1] In the vast majority of cases, Scalia opines, "I expect that Congress *neither* (1) intended a single result, *nor* (2) meant to confer discretion upon the agency, but rather (3) didn't think about the matter at all." Hence, what the administrative agency (or a court) would infer about legislative intent "represents merely a fictional, presumed intent." *Id.*

In the absence of legislative direction to the contrary, we have only the words of the statute as they are written. And we must take those words in their plain and ordinary meaning. I agree with Judge Teitelman's conclusion as to their plain and ordinary meaning. Surely the manner by which the state plans to execute Middleton and the others awaiting a death sentence is a matter of concern to segments of the public and not "only" to the inmates who are to be injected with the prescribed lethal cocktail.

In my imagination, I can see the same legislative "intent" as the principal opinion seems to see in this case. I imagine that if Judge Teitelman's reading of the statute were to prevail, today's legislature hastily would pass a statute explicitly exempting the execution protocol. But it is not our job as judges to rewrite or pre-write a statute to say what we imagine the legislature would say. Actually writing statutes is purely the job of legislators.

1. Antonin Scalia, *Judicial Deference to Administrative Interpretations of Law,* 1989 Duke L.J. 511, 517 (1989).

We judges should use the legislature's words as they are given to us. If legislators disagree with the results their current words produce, they can legislate and give us some new words. This would seem more lawful than for the Court to be imagining what these lawmakers would do and calling it statutory interpretation.

I join Judge Teitelman's opinion, and I respectfully dissent.